**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| NORTH AMERICAN SPECIALTY<br>INSURANCE COMPANY,<br>*Plaintiff(s)* | }<br>}<br>}<br>} | |
| v. | }<br>} | CIVIL ACTION NO. H-03-2922 |
| ROYAL SURPLUS LINES INSURANCE<br>COMPANY, *et al.*,<br>*Defendant(s)* | }<br>}<br>}<br>} | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are the following motions:

(1) CUIC's Motion for Partial Summary Judgment on Issues Left Unaffected by the Court's Disposition of Royal's Motion for Partial Summary Judgment (Doc. 61).

(2) Motion to Remand of Defendant / Third Party Defendant Velma Carr, as Heir at Law and the Representative of the Estate of Raymond Carr, Deceased (Doc. 66).

(3) North American Specialty Insurance Company f/k/a Commercial Underwriters Insurance Company's Partially Opposed Motion for Leave to File Second Amended Complaint and Motion to Restyle the Case (Doc. 84).

(4) North American Specialty Insurance Company's (f/k/a Commercial Underwriters Insurance Company's) Motion for Leave to File a Supplement to its Motion for Partial Summary Judgment on Issues Left Unaffected by the Court's Disposition of Royal's Motion for Partial Summary Judgment (Doc. 86).

(5) Defendant Evanston Insurance Company's Motion for Summary Judgment (Doc. 99).

(6) NAS's Motion for Partial Summary Judgment Against Velma Carr (Doc. 95).

After reviewing the record, the parties' motions and supporting briefs, and the applicable law, the Court rules as follows. The Court finds that the record establishes that there is no genuine dispute as to the fact that North American Specialty Insurance Company ("NAS"), and not Commercial Underwriters Insurance Company ("CUIC"), is and always has been the real party in interest in this action. Accordingly, the Court **ORDERS** that (1) Plaintiff's Motion for Leave to File Second Amended Complaint and Motion to Restyle the Case (Doc. 84) is **GRANTED** and (2) Carr's Motion to Remand (Doc. 66) is **DENIED**. This Court has and has always had diversity jurisdiction over this action. NAS's motion for leave to file a supplement to its motion for partial summary judgment (Doc. 86) is **GRANTED**. As set forth more fully below, NAS's Motion for Partial Summary

Judgment on Issues Left Unaffected by the Court's Disposition of Royal's Motion for Partial Summary Judgment (Doc. 61) is **GRANTED-IN-PART and DENIED-IN-PART**. In accordance with the Court's rulings on NAS's motion for partial summary judgment and with its previous rulings in this case, Evanston's motion for summary judgment (Doc. 99) is **GRANTED**. Finally, NAS's Motion for Partial Summary Judgment Against Velma Carr (Doc. 95) is **DENIED**.

I.   **NAS'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

The Court set forth the factual background to this case at length in a previous order.[1] NAS's motion for partial summary judgment asks the Court to rule in the affirmative on the following issues, which NAS contends were "unaffected" by this Court's prior summary judgment ruling:

> (1) Whether defense costs in the *Carr* matter must be allocated to a primary HPL coverage part that has not been eroded, or, in the alternative, spread across all triggered HPL coverage parts?
>
> (2) Whether NAS "has no obligation to pay any portion of the first $1 million in damages, without regard to whether the first $1 million is paid by the insureds or any insurers"?[2]
>
> (3) Whether there is no coverage for Heritage Housing under NAS's policies?
>
> (4) Whether NAS's policies contain exclusions precluding coverage for punitive damages?

There is no opposition to NAS's contention that its policies contain exclusions precluding coverage for punitive damages. Accordingly, the Court rules in NAS's favor on that issue. With respect to the remaining issues, the Court (1) denies NAS's motion for summary judgment on the allocation of defense costs and attachment point issues, and indeed affirmatively rules against NAS on those issues; and (2) stays any ruling on the issue of coverage for Heritage Housing until a decision has been rendered by the state court of appeals.

---

[1] *See Memorandum and Order of 29 October 2004* (Doc. 58) at 1-6.

[2] *NAS's Partially Opposed Motion for Leave to File Second Amended Complaint and Motion to Restyle the Case* (Doc.84) ¶ 8.

**A.     The Stacking or Spreading of Defense Costs in Consecutive Erosion Policies**

NAS's first argument is that the defense costs in the *Carr* matter must be allocated to a primary HPL coverage part that has not been eroded, or in the alternative, spread across all triggered HPL coverage parts. Specifically, NAS contends that (1) the Court should "maximize coverage" by allocating defense costs to a Royal or Evanston policy other than the one that will be selected to provide indemnity for the *Carr* judgment; or (2) Royal and Evanston should be required to spread the defense and appellate costs over all three triggered primary policies. The defense cost issue raised by NAS is an issue of first impression in Texas. Nevertheless, the Court agrees with Royal that (1) the anti-stacking principle announced by the Texas Supreme Court in *American Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842 (Tex. 1994), should be extended to apply to defense costs when, as here, "eroding" policies are involved; and (2) this Court's order granting Royal's motion for partial summary judgment effectively disposed of this issue on that basis because it determined that (a) there was one medical incident as defined by the Royal policies, (b) the limits of the primary policies could not be stacked, (c) Royal's policy limits are eroded by defense costs, and (d) "as a matter of law, CUIC [*i.e.*, NAS] is obligated to indemnify the insureds when the applicable Royal policy has been exhausted by the combined total of supplementary payments, which includes the aforementioned items [defense costs and interest], and damages up to policy limits."[3] Furthermore, contrary to NAS's assertions, neither *Texas Prop. & Cas. Ins. Guar. Ass'n / Southwest Aggregates Inc. v. Southwest Aggregates, Inc.*, 982 S.W.2d 600 (Tex.App.–Austin 1998 no pet.), nor *Royal Insurance Company of America v. Hartford Underwriters Insurance Company*, 391 F.3d 639 (5th Cir. 2004), establishes that stacking of policies is allowed for defense costs under Texas law. Accordingly, NAS's motion for partial summary judgment on the defense cost issue is denied.

**B.     Alleged Uninsured Gap Between the Royal and NAS Policies**

The Court also rejects NAS's contention that it "is not responsible for the $1 million of damages, whether or not the first $1 million is paid," such that there is a gap in coverage (in this

---

[3]*Memorandum & Order of 29 October 2004* (Doc. 58) at 27-28.

particular case a substantial gap) between the Royal and NAS policies because of the fact that Royal's policies are eroded by defense costs.

As a preliminary matter, the Court notes that NAS's policies are following form policies to the Royal policies.[4] NAS's underwriting file contains Royal documents showing that the Royal policies were eroded by defense costs,[5] and thus when NAS agreed to bind coverage for the insureds, it did so and it chose the excess policy language with knowledge of the eroding nature of the Royal policies. NAS now argues that a proper construction of its policy language leaves a gap in coverage for the insureds. The Court disagrees.

The NAS policies contain virtually identical relevant provisions, which the Court will quote here at length:

> **I.  EXCESS LIABILITY COVERAGE**
>
> A. The Company will indemnify the insured for the amount of **loss** that is in excess of the **underlying limits**, provided the injury or damage is covered by the **designated underlying policy** under the coverages or coverage parts set forth in Item 4 of the Declarations.
>
> B. The amounts that the Company is obligated to pay are limited as described under Insuring Agreement IV – "LIMIT OF LIABILITY." The Company shall have no other obligation or liability to pay sums or to perform services or acts except as specifically described under Insuring Agreement II – "DEFENSE AND SETTLEMENT," under Insuring Agreement III – "COSTS AND APPEALS," and under Insuring Agreement VI – "MAINTENANCE OF UNDERLYING INSURANCE."
>
> C. Except when stated to apply otherwise, this policy is subject to all of the terms, conditions, insuring agreements, definitions, and exclusions (hereinafter called "provisions") of the **designated underlying policy**; but in no event shall this policy be subject to the provisions of the **designated underlying policy** with respect to the premium, the policy period, the renewal or extension agreement (if any), the amount or limits of liability, or any other provision of the **designated underlying policy** that may be inconsistent with this policy.
>
> \* \* \*
>
> **II.  DEFENSE AND SETTLEMENT**
>
> A. This policy is subject to any obligation contained in the **designated underlying policy** to assume responsibility for the defense of any suit brought against the insured; provided, however, it is expressly agreed that such obligation shall attach to the Company only after

---

[4]*See* Endorsement No. 1, AMENDATORY ENDORSEMENT, which states the following:
It is agreed that item #4, Description of Excess Coverage, as per the policy declaration form CEL-101 (11/92), is hereby amended to read as follows:
   ITEM 4.  Description of Excess Coverage:  FOLLOWING FORM EXCESS GENERAL LIABILITY INCLUDING PROFESSIONAL LIABILITY, . . . .

[5]*See* Doc. 72 Exs. B & C.

4

1. the full amount of the **underlying limits** has been paid by or on behalf of the insured, and

2. there is no further obligation under the **underlying insurance** to assume responsibility for the defense of the suit.

   Thereafter, such obligation shall attach to the Company only when the suit arises out of a claim or insured event to which this policy applies under the terms of Insuring Agreement V. The Company may settle any suit it defends as it deems expedient. In no event shall the Company be obligated to defend any suit after the applicable limit of the Company's liability has been exhausted by the payment of loss and/or costs.

   \* \* \*

   **IV.    LIMIT OF LIABILITY**

A. The limits of liability stated in Item 5 of the Declarations [$5 million] and the rules described in this Insuring Agreement shall establish the maximum amounts that the Company is obligated to pay for loss and/or costs under this policy, regardless of the number of:

   1. insureds,
   2. claims made or suits brought,
   3. persons or organizations making claims or bringing suits, or
   4. automobiles, aircraft, or watercraft to which this policy applies.

   B.    It is expressly agreed that liability shall attach to the Company

(i) only with respect to such coverages or coverage parts as are set forth in Item 4 of the Declarations, and

(ii) only with respect to claims or insured events to which this policy applies under the terms of Insuring Agreement V.

   and then only after the insured has paid or has become legally liable to pay the full amount of the underlying limits.

   \* \* \*

   **VI.    MAINTENANCE OF UNDERLYING INSURANCE**

A. Insurance for the coverages or coverage parts set forth in Item 4 of the Declarations shall be maintained in full effect by the first **named insured** during this **policy period**. Such insurance shall afford limits of liability not less than the amounts scheduled in Item 6 of the Declarations (except as specifically described below under Insuring Agreement VI.B. with respect to aggregate limits of liability). It is expressly agreed that such insurance shall not afford sub-limits of liability with respect to any coverage or with respect to any portion of any coverage to which this policy applies.

   Failure of the first **named insured** to comply with this Agreement shall not invalidate this policy, but in the event of such failure, the Company shall be liable under this policy only to the same extent it would have been liable had the first **named insured** complied with this Agreement.

   \* \* \*

   **PART II – DEFINITIONS**

   A.    When used in this policy, including endorsements forming a part thereof:

\* \* \*

    2.    "Costs" means:

(a)    Interest on judgements;

(b)    Investigation, adjustment, settlement, and legal expenses, including taxed court costs and premiums on bonds:

3.    "Damages" means pecuniary sums that the insured is legally responsible to pay, as determined by:

(a)    a judgement against the insured in a **suit** on the merits, or;

(b)    a settlement of a claim or **suit** with the Company's prior written consent.

4.    "Designated Underlying policy" means the insurance policy or policies indicated in Item 7 of the Declarations, (including any renewal or replacement thereof).

5.    "Loss" means **damages** because of injury or damage to which this policy applies, less all recoveries and salvages; but "loss" does not include:

(a)    Interest on judgements; or

(b)    Investigation, adjustment, settlement, and legal expenses, including taxed court costs and premiums on bonds.

\* \* \*

11.    "Underlying Insurance" means:

(a)    the **scheduled underlying policy**, and

(b)    any other insurance available to the insured providing coverages to which policy applies, other than insurance purchased specifically to apply

(i)    in excess of the Company's limit of liability under this policy, or

(ii)    as contributing insurance to the layer of insurance provided by this policy.

12.    "Underlying Limits" means, subject to the minimum requirements set forth in the Insuring Agreement VI ("Maintenance of Underlying Insurance"), the sum of the applicable limits of liability of all **underlying insurance** available to the insured (including any deductible amount or other participation by the insured), provided that such **underlying insurance** shall be deemed applicable and available to the insured irrespective of

(a)    the bankruptcy or insolvency of any insurer of the **underlying insurance**, or

(b)    any defense that any insurer of the **underlying insurance** may assert, or

(c)    the insured's failure to comply with any policy agreement or condition of the **underlying insurance**, or

(d)    any reduction in the aggregate limits of liability contained in the **underlying insurance** (other than as specifically described under Insuring Agreement VI.B. of this policy).[6]

\* \* \*

---

[6] *See* NAS Policy Nos. CEL 015843 & CEL 016732 at Doc. 61 Ex. E.

As the Court reads this language, there is no gap in coverage. Pursuant to the plain terms of the policies, NAS agreed to "indemnify the insured for the amount of loss that is in excess of the underlying limits." NAS now argues that because its policies define "loss" so as to exclude defense costs, it is only obligated to pay that portion of the damages which exceeds $1 million.[7] NAS's argument misconstrues its own policy language: NAS, in short, conflates the terms "loss" and "underlying limits." "Loss" is what NAS has to pay; "underlying limits" are what have to be exhausted for NAS's policy to attach. The definition of "underlying limits" in the NAS policy is not limited to actual damages. The underlying limits are, quite simply, the limits of the underlying Royal policy available to the insured, which in this case is $1 million as eroded by defense costs. Once the underlying limits have been exhausted, NAS must then indemnify the insured for the amount of "loss" (*i.e.*, damages) in excess of the underlying limits. NAS does not indemnify the insured for defense costs or the like because each NAS policy contains an obligation to defend when the underlying limit is exhausted. In sum, the Court finds that NAS's policies attach once the underlying limits are exhausted, so that at that point NAS is obligated to indemnify for damages and to provide a defense. There is no gap in coverage between the policies in this action. NAS's request for summary judgment that there is such a gap is denied.

C. **Coverage of Heritage Housing by the NAS Policies**

Because, as all parties in this matter recognize, the state court of appeals hearing the appeal of the underlying *Carr* lawsuit may render the issue of coverage for Heritage Housing moot this Court will stay any ruling on that issue until the state court of appeals has made its ruling. The parties should file an appropriate status report with the Court once the state court of appeals has rendered a decision.

---

[7]NAS also originally argued that its policies were not triggered until someone (*i.e.*, anyone) actually paid $1 million to Mrs. Carr. NAS has since acknowledged that that position is "untenable" in light of its policy language. Doc. 79 at 2.

## II. EVANSTON'S MOTION FOR SUMMARY JUDGMENT

NAS's response breaks Evanston's motion for summary judgment down to four issues: (1) Indemnity stacking; (2) Defense fees allocation; (3) whether Evanston's obligations, if any, run only to Royal; and (4) CGL Coverage. NAS concedes that Evanston is entitled to summary judgment on the first and fourth issues, and further concedes that Evanston is entitled to summary judgment on the third issue *if* the Court rules for Evanston on the second issue. The Court has ruled for Evanston on the second issue, defense fees allocations, as set forth above. Accordingly, the Court now orders that Evanston is entitled to summary judgment and its motion is granted.

## III. NAS'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CARR

Finally, the Court is confronted with NAS's motion for partial summary judgment against Velma Carr. That motion seeks a declaratory judgment from this Court holding that there is no coverage under NAS's excess policies for any damages assessed against Heritage Housing or Heritage VIII because those "insureds and their principals wholly failed to participate in the defense of the *Carr* lawsuit."[8] "To breach its duty to cooperate, an insured's conduct must materially prejudice the insurer's ability to defen[d] the lawsuit on the insured's behalf." *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 468 (5th Cir. 2002). While NAS suggests that the Fifth Circuit "inadvertently" misstated the law on this issue in *Quorum Health Resources*, this Court disagrees: there is no relevant distinction between "material" and "actual" prejudice. Furthermore, the Court also rejects NAS's invitation to invent new Texas law for its benefit: NAS asks the Court to apply a different prejudice standard for excess insurers, so that "NAS is excused from the requirement to show *any* prejudice as a result of the corporate insureds' material breach."[9] Despite NAS's extensive ruminations on this issue, the simple fact remains that no court

---

[8] Doc. 95 at 3.

[9] *Id.* at 23 (emphasis in original).

applying Texas law has ever held that a different standard of prejudice should be applied to excess carriers asserting a non-cooperation defense.

NAS's motion fails to demonstrate that, as a matter of law, it was actually / materially prejudiced by its insureds' failure to cooperate. NAS summarizes its position as to how it was actually prejudiced as follows:

> ...NAS was "actually" prejudiced by the failure of the corporate defendants to appear at their trial. Mr. Marks' [Carr's counsel's] repeated, damning references to the absent corporate defendants were calculated to, and undoubtedly did, inflame the jury to award excess-level actual damages "against" Heritage Housing and Heritage VIII. Additionally, their failure to turn over documents and otherwise assist Ms. Smith may have precluded her from insulating one of the insureds from liability....[10]

While the Court agrees that ordinarily an insured's failure to appear at trial or to participate in reasonable discovery is a significant lapse in its duty to cooperate, the circumstances in the underlying *Carr* suit were not ordinary: there is no dispute that, by the time of trial and for at least several months leading up to trial, Heritage Housing and Heritage VIII were defunct entities that had ceased to exist for all practical purposes. In any case, even assuming the defunct corporate insureds could have meaningfully participated in their defense, NAS has failed to demonstrate that it was actually prejudiced by their failure to do so. NAS's arguments regarding the effect of both Mr. Marks's closing argument and the failure to turn over documents are supported by nothing more than speculation. The underlying record demonstrates that Mr. Marks made an extensive closing argument that drew upon a record replete with facts far worse than the insureds' absence at trial. NAS has marshaled no evidence to demonstrate that the absence comments actually had any effect on the jury's verdict. With respect to the failure to turn over documents, NAS's motion fails to demonstrate that (1) there actually were more documents to produce and (2) that any such documents would have been helpful to the defendants' case. In sum, NAS has failed to demonstrate that it was actually prejudiced and, accordingly, its motion for partial summary judgment against Carr is denied.

---

[10]*Id.* at 25.

## IV. CONCLUSION

For the reasons set forth above, the Court **ORDERS** that:

(1) Plaintiff's Motion for Leave to File Second Amended Complaint and Motion to Restyle the Case (Doc. 84) is **GRANTED**;

(2) Carr's Motion to Remand (Doc. 66) is **DENIED**;

(3) NAS's motion for leave to file a supplement to its motion for partial summary judgment (Doc. 86) is **GRANTED**;

(4) NAS's Motion for Partial Summary Judgment on Issues Left Unaffected by the Court's Disposition of Royal's Motion for Partial Summary Judgment (Doc. 61) is **GRANTED-IN-PART and DENIED-IN-PART**: specifically, (a) NAS's motion for partial summary judgment on the defense cost issue is denied; (b) NAS's motion for partial summary judgment on the gap in coverage issue is denied; (c) decision on whether NAS's policies cover Heritage Housing is reserved pending decision by the state court of appeals; and (d) NAS's motion for partial summary judgment that its policies contain exclusions precluding coverage for punitive damages is granted.

(5) Evanston's motion for summary judgment (Doc. 99) is **GRANTED**; and

(6) NAS's Motion for Partial Summary Judgment Against Velma Carr (Doc. 95) is **DENIED**.

**SO ORDERED** at Houston, Texas, this 28th day of September, 2005.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE